# EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**
Employment Arbitration Tribunal

In the Matter of the Arbitration between

Case Number: 01-22-0002-8503

Virginia Smotherman, Individually and O/B/O the
the Estate of Pollyanna Smotherman
-vs-
GMP Southeast, LLC and GPM Investments, LLC D/B/A
E-Z Mart and John Doe

**FINAL AWARD OF ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the personnel manual or employment agreement entered into by the above-named parties on or about dated September 8, 2019, and having been duly sworn and having duly heard the proofs and allegations of the parties, and Claimant being represented by Cody Dishon, Esq. and Javier Cabanillas, Esq. of The Ferguson Law Firm, L. L.P., and Respondents being represented by Ian McLin, Esq. and Steven Browne, Esq. of Langley & Banack, hereby AWARD, as follows:

The matter before the Arbitrator is a Claim timely filed with the American Arbitration Association on July 6, 2022, by Virginia Smotherman (hereinafter "Claimant" or "Claimant Smotherman" or "Virginia") against GMP Southeast, LLC and GPM Investments, LLC D/B/A E-Z Mart (hereinafter "Respondents"; the two cited Respondents at times in this Award may be referred to individually due to corporate structure). The Claim sought wrongful death and survivor damages and was filed pursuant to a mandatory arbitration provision as acknowledged and signed by the deceased, Pollyanna Smotherman (hereinafter the "deceased" or "Pollyanna"), an employee of Respondent. Respondent filed a timely Answer, setting forth numerous defenses including a general denial. Following the Claim filing a Scheduling Order dated October 25, 2022, was issued and controlled the processing of the Claim.

Respondent John Doe (hereinafter referred to as "Respondent Doe") was added following the timely filing by Respondent GPM Investments of a Motion for Leave To Designate Responsible Third Party pursuant to Texas Civil Practice & Remedies Code §33.004(j). The Motion was contested by Claimant on timeliness grounds. Following filings by the parties, the Arbitrator ordered that Respondent Doe be added to the case and reminded Respondents that Code Provision §33.004(h)(i)(1) states the granting of a motion for leave to designate a responsible third party "does not by itself impose liability on the person". Thus, Respondent(s) retain their burden of proof concerning the potential liability of the added party. As made obvious by the designation, the actual identity of this Respondent was (and remains) unknown.

Pursuant to the Scheduling Order (as modified due to the death of Claimant), an in-person arbitration hearing was conducted in San Antonio, TX on February 19-20, 2024. All named parties to the Claim were present (not including Respondent Doe) and represented by competent counsel as identified above. All named parties were given a full and fair opportunity to present their cases. A total of eight witnesses were called (two by video deposition). Two of the witnesses (one per side) were offered as

experts. While more will be said at a later point in this Award, the Arbitrator recognizes both as experts in their highly divergent fields and they are so designated. All exhibits marked by the named parties were admitted into evidence without objection. In lieu of closing statements, Claimant and Respondent timely submitted post-hearing briefs as well as proposed finding of facts and conclusions of law. With receipt of the final filings, the hearing and record were closed effective April 8, 2024.

By agreement of the named parties at the arbitration hearing, Respondent GPM Southeast, LLC was dismissed from the Claim; therefore, the only remaining corporate Respondent is GPM Investments, LLC.

Respondent is a non-subscriber to the Texas Worker's Compensation system for all relevant time periods.

Claimant, the mother of the deceased, timely filed this Claim individually and on behalf of the estate of the deceased seeking damages for wrongful death and survivor benefits following the murder of the deceased on July 29, 2020 while she was employed and on duty at Respondent's Garden Ridge, TX gas station/convenience store. Claimant at the time of filing was the Executor of the deceased's estate as well as the named beneficiary of the deceased for purposes of Respondent's benefit plans. Prior to the scheduled arbitration hearing for this case, Claimant died unexpectedly. Thereafter, the deceased's sister and Claimant's daughter, Harriett Rehman, filed a Second Amended Pleading as the Administrator of the estates of Claimant and the deceased. Respondent filed a Motion To Strike this Pleading but did not object to the substitution of Rehman as administrator of the deceased's estate. Therefore, Harriett Rehman is substituted as Claimant for this Claim and will be referred to as Claimant or Claimant Rehman. Both Claimant's Second Amended Pleading and Respondent's Motion To Strike remain open issues, with the Arbitrator deferring ruling on both due to the filing of each within days of the arbitration hearing. No prejudice was created to either party by the deferral. Both the Pleading and Motion will be ruled on immediately below.

Respondent also filed a Motion To Dismiss Wrongful Death Claims. The Arbitrator again deferred ruling due to the filing within days of the arbitration hearing. No prejudice was created to either party by the deferral. This Motion will also be ruled on immediately below.

Concerning the three filings, all were made subsequent to the deadline set forth in the Scheduling Order. However, these filings all relate to the untimely and unanticipated death of Claimant in September 2023 and as a result could not have been filed within the time frame set forth in the Scheduling Order. Additionally, it was not until early January 2024 that Claimant's daughter (Rehman) was duly appointed as Administrator of her mother's estate. Both parties could have made the three filings early than they did, but even if this had occurred all would have been beyond the Scheduling Order time frame. The Arbitrator has reviewed the filings and the surrounding representations by the parties and finds that neither side has been surprised nor prejudiced by the late filings. Accordingly, the Arbitrator is exercising his discretion to accept these filings. It must be noted, however, that while the filings are accepted the underlying issues that are presented in the filings remain open for proof and ruling in this Award.

A brief overview of the underlying facts of this case will now be discussed. The facts are largely uncontested and will be presented as such unless a specific mention is made to the contrary.

Pollyanna Smotherman, now deceased, was a 40-year old woman who worked for Respondent at its Garden Ridge, TX gas station/convenience store (hereinafter "the store"). The address for the store is 19501 FM 3009. Garden Ridge is a city located northeast of San Antonio and is situated in Comal County. She was first hired by Respondent in 2018, having previously been hired by E-Z Mart at the

Garden Ridge location, and then transitioning to Respondent's employee roster. Since that date she was continuously employed by Respondent at that location. Respondent, at the time of the incident in question, had owned the store for approximately three years after purchasing the store (and others) from a company called E-Z Mart. The store continues to display E-Z Mart signage and is branded as a Shell gasoline station. The store is located at the traffic light controlled intersection of Routes 2252 and 3009: Route 2252 is a two lane paved road and Route 3009 is a paved four lane, although at the intersection additional turning lanes enlarge the Routes to four and six respectively. The store sits in a depression on the southwest corner of the intersection and is therefore below road grade level. The store occupies the north corner of the building with at least two other unrelated businesses sharing the overall structure; neither of these businesses were open during the time of the incident in question and neither play a role in this matter. The intersection is approximately 1.8 miles from I-35 to the southeast, connected by Route 3009.

The deceased was employed as a store clerk by Respondent and was well regarded by management and co-workers. Respondent's witnesses spoke highly of her. She normally worked daylight shifts but on request by management worked the overnight shift, sometimes referred to as the 3rd shift; referenced work hours for that shift were 11PM-7AM. The store was open 24 hours a day. On July 28, 2020, the deceased was requested to work the overnight shift (beginning on July 28 but extending overnight into July 29) due to a clerk vacancy and she agreed to accept the shift despite safety concerns of working alone that she had previously voiced to co-workers and store management as well as to family members including both her mother and sister.

The practice of the store was to have one clerk on duty for the overnight shift and that was the case on July 29. The other two shifts (1st and 2nd) have two employees per shift, namely one clerk and either the Store Manager of the Assistant Store Manager. As recorded on video surveillance both inside and outside the store, at approximately 3:01 AM an unidentified male entered the store; he was wearing a face mask (or bandana) and carrying a gun. The intruder is now identified for purposes of this Claim as Respondent Doe. As of this date, the true identity of Respondent Doe remains unknown despite extensive police efforts to locate and identity. Testimony indicates that the robbery and murder are now considered a "cold case" by the police, and thus the likelihood of Respondent Doe being identified is remote.

Respondent Doe confronted the deceased inside the store and forced her at gunpoint to go behind the counter and give him the cash on hand as well as lottery tickets. The deceased cooperated with the intruder and in all matters followed store policy and procedures for responding to a robbery. In providing cash register money the deceased triggered a "bill trap" silent alarm and that alerted the 24-hour surveillance security company to initiate procedures to contact the store as well as the local police. After obtaining cash and lottery tickets Respondent Doe discharged his firearm into the deceased's head and she immediately fell to the floor. Respondent Doe fled the store, following the same path of his entry and was never seen again. Local police responded within minutes and found the deceased lying on the floor behind the counter. Her body was twitching and this continued as documented by the video surveillance and police reports. Within minutes other emergency personnel arrived. The deceased did not recover from her wounds and the store was turned into a crime scene.

The Arbitrator realizes that this truncated summary of undisputed facts barely scratches the surface of the details that are well documented in the record, whether by testimony, exhibits, or video recording. To the degree that more detail is required to examine the arguments of both sides, that will be discussed in depth in later parts of this Award.

At this point the Arbitrator directs attention to the filings by the parties as it is at this point that the analysis of legal positions must begin. Claimant filed this Claim alleging negligence and gross

negligence. Respondent countered with defenses including a general denial, responsible third party, and numerous affirmative defenses. While each of these have been carefully considered by the Arbitrator, there is a particular affirmative defense that needs to be addressed at the beginning of the legal analysis because, if granted, it would end the Claim without any need for further analysis.

Respondent has pled accord and satisfaction. Briefly put, Respondent had in place a Texas Occupational Injury Benefit Plan (hereinafter the "Plan" or "SPD") at all relevant times for this Claim and specifically on the date and time when the deceased lost her life in a workplace incident. This ERISA Plan was unilaterally created by Respondent in 2018 and was done for the purpose of "protecting . . . themselves from certain liabilities as nonsubscribers to the Texas workers' compensation insurance system . . . ". Among other things, upon the occurrence of certain events, one of which was death, the "Plan **shall** pay such Participant's Beneficiary a Death Benefit equal to $100,000 . . . " (emphasis added). The Plan language goes on to state that "The Death Benefit **shall** be paid to the Participant's Beneficiary as follows: (1) 20% of the Death Benefit **shall** be paid in a lump sum cash payment as soon as administratively possible following the death of the participant and the determination of the proper Beneficiary; and the remainder of the Death Benefit **shall** be paid in 35 equal monthly installments . . ." (emphasis added). For purposes of this Plan language, Pollyanna was a Participant and Virginia was the Beneficiary. Additionally, the Plan states that "the Plan **shall** reimburse reasonable burial expenses to any person who incurs liability therefor, up to $10,000." (emphasis added)

Before death and funeral benefits were paid to the Beneficiary, there was correspondence between Claimant and Respondent. Respondent's position was that acceptance of death and funeral benefits would "require a release under the Plan". Whatever further discussions occurred is not detailed in the record, but the end result was that both the Death Benefit and Funeral Benefit were released to the Beneficiary without the signing of a release. At the time of the Beneficiary's death, the final monthly payments were not completed but the parties agreed that the death payments were to be fully satisfied in April, 2024.

The question thus becomes whether accord and satisfaction has occurred and Respondent has the burden of proof in this regard. As discussed below, Respondent has not carried its burden of proof and the Arbitrator dismisses Respondent's accord and satisfaction affirmative defense.

At the heart of the matter is the Texas Workers' Compensation system. Texas, unlike certain other States, allows employers who choose to do lawful business within the State to opt out of the State system. By offering this alternative, the State allows employers to forego immunity from civil action, and withholds certain defenses in the event of a civil action being filed. By being a subscriber, an employer has conferred upon them immunity from civil actions for redress of harm caused by them in the employment relationship. Whether to opt in or opt out is a balancing act by an employer.

In this case, Respondent chose to opt out. To Respondent's credit, their creation of the Plan is laudatory in that it provides benefits that ease the financial burden on injured employees and by doing so lessens the likelihood that injured employees will choose to bring a civil action. But Respondent's attempt to create immunity for itself falls short because that can only be created by the Legislature.

The Arbitrator reviewed the Plan in detail and finds that Respondent's unilaterally created Plan established vested benefits for employees and their beneficiaries in the event of a workplace injury, and this vesting was immediate and without any conditions. No waiver was required to receive the vested benefit, and no waiver was signed by Claimant.

Without the need for further discussion or review, the receipt of Plan benefits by Claimant did not constitute an election of remedies and thus did not preclude her from filing and pursuing this Claim. By so ruling, the Arbitrator also dismisses two additional affirmative defenses of Respondent, namely waiver and defense of payment.

The next matter for review is Respondent's Motion To Dismiss the wrongful death claim originally filed by Virginia and now advanced by Rehman on behalf of her mother's estate. Respondent seeks to have this cause of action dismissed as a matter of law, arguing that the Wrongful Death Statute, Texas Civil Practice & Remedies Code Chapter 71 does not preserve or cause to survive a cause of action for wrongful death damages upon the death of the beneficiary. Instead, the statute and Texas case law provides that such wrongful death claims are extinguished by the death of the wrongful death beneficiary. Claimant disputes this position, arguing that Texas law provides a continuance of Plaintiff's (Claimant's) claims when that Plaintiff (Claimant) dies after suit has been commenced. Additionally, Claimant argues that the attempted amendment does not expand the original Claim but rather only seeks to preserve the Claim, although admittedly only until the death of Claimant.

Both sides provided considerable citations, both to Texas statutory provisions as well as to case law. In reviewing these, it is clear that statutes as well as controlling case law in Texas that interpret these statutes requires the Arbitrator to grant Respondent's Motion To Dismiss the wrongful death claim and it is so ordered.

Moving forward with the Claim, attention will now be directed to Claimant's causes of action. Claimant alleges negligence as well as gross negligence on the part of Respondent and further alleges that the deceased's injuries, death and damages were proximately caused by Respondent's actions and omissions. Claimant carries the burden of proof for these matters. In addition to deciding whether Respondent was negligent, the issue of foreseeability also needs to be examined in order to establish the causal link between the negligence (if any) and decedent's injuries and damages.

In so reviewing, the Arbitrator has the option to examine the evidence and make a finding concerning negligence and then if it is determined that negligence occurred to then examine the foreseeability claim, or to first determine if the robbery of the store and the murder of the decedent were foreseeable. The Arbitrator has chosen the latter for the reason that a negative finding as to foreseeability would eliminate the need to inquire into potential negligence. For reasons discussed below, the Arbitrator finds that the robbery and murder were foreseeable by Respondent.

There is much clear evidence set forth in the record that the robbery of the store and the murder of the decedent were foreseeable by Respondent and Claimant has carried its burden of proof in this regard. The best evidence of Respondent's foreseeability is their various policies and procedures. The Arbitrator notes that Respondent's policies and procedures are extremely thorough and well written. In fact, Claimant's expert reached the same conclusion and testified to that effect at the arbitration hearing. The thoroughness and content of these documents is consistent with Respondent being a large corporation, operating approximately 3,200 gas station and convenience stores in 33 States, and being estimated by Respondent's Corporate Representative as being the fifth largest in the United States in that market. Testimony shows that Respondent not only has extensive policies but also requires all employees to take training on their policies; also all employees must achieve a passing grade when completing the mandatory online training. Testimony further indicates that all Garden Ridge employees, including the deceased, completed their training and passed the testing.

In reviewing Respondent's documents, specific attention is drawn to the E-Z Mart Store Operations Guide. That document has a specific section entitled **Crime Prevention** (bolding original to the document). The first heading of that document is entitled **Robbery Deterrence** (bolding original to the

document). In the opening paragraph, the following language appears: "The occurrence of a robbery or other crime at an E-Z Mart location is a possibility." While the contents of this document will be discussed in further detail below, the point remains that robbery was a foreseeable event for a sophisticated business that operates retail stores of this nature. In fact, Respondent's expert testified that robbery is an inherent threat for gas station/convenience stores due to three factors: cash on hand, alcohol availability, and late-night hours. Beyond the document, Respondent's witnesses at the arbitration hearing acknowledged the possibility of robberies, and in fact the Store Manager had been robbed while working at a gas station/convenience store prior to working for Respondent (and prior to that E-Z Mart). In fact, the only witness who testified that the robbery on the night in question was not foreseeable was Respondent's expert witness. That opinion, which is in direct opposition to his other testimony described in this same paragraph, is rejected by the Arbitrator as being inconsistent with Respondent's policies and procedures.

Beyond Respondent's policies and procedures, there was other action by Respondent that conclusively demonstrated that robbery was foreseeable. Respondent employed the use of 16 video cameras (3 outside and 13 inside the store) and engaged a company to monitor video surveillance footage 24/7/365. Respondent also had a strict cash handling system and kept its money locked up 24/7/365 (although, as discussed below, it forbid its Garden Ridge employees from locking up the store for any reason even for the minute or two needed to go to the restroom).

The Arbitrator recognizes that not every harmful event is foreseeable. For instance, while it is possible for a Southwest Airlines plane on final approach to the San Antonio International Airport to crash into the Garden Ridge store and kill a clerk at 3AM, it is not foreseeable and does not warrant a corporate policy and procedure. But a robbery of a store of this nature is entirely foreseeable and Respondent by having the policies and procedures mentioned above clearly foresaw this type of occurrence.

Clearly, robbery of the Garden Ridge store was foreseeable and the Arbitrator so finds, but the issue remains as to whether bodily harm including murder was also foreseeable. The Arbitrator makes a finding that the murder of an employee during the course of a robbery was also foreseeable and in fact Respondent's own policies and procedures (as discussed above) recognized this danger by training employees to cooperate with robbers so as to lessen the likelihood of harm.

Moving forward, the next matter for review is whether Claimant carried its burden by establishing negligence on the part of Respondent concerning the robbery and murder. For reasons detailed below, the Arbitrator makes a finding that Claimant met its burden of proof.

Claimant alleges negligence on the part of Respondent, and while this term is regularly used in the conduct of cases it is well to define it to focus our review. *Black's Law Dictionary* defines negligence as "The omission to do what a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonable and prudent man would not do." Also of interest is the definition of gross negligence, and *Black's Law Dictionary* defines it as follows: "The intentional failure to perform a manifest duty in reckless disregard of the consequence as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness." Against that backdrop we will now review the evidence presented by Claimant.

Perhaps the best starting point for this inquiry is a document relied upon by both parties to support their respective positions, and that is the OSHA report that was compiled following their extended investigation of the workplace fatality and issued in an email dated December 2, 2020, to Respondent, with the full OSHA file dated August 2, 2021, being later issued under a FOIA request to Claimant. Claimant seizes upon the report to show Respondent's operational deficiencies whereas Respondent

points to the fact that OSHA did not issue a citation but rather only listed "suggestions". The Arbitrator finds the entire OSHA file as released is of great importance to this Claim evaluation, particularly as it was a contemporaneous neutral investigation of the store and procedures. The Arbitrator has had many dealings with OSHA during his career and has noted that their investigations have typically been thorough, even if their legal conclusions were later questioned in administrative forums. The Arbitrator also recognizes that OSHA's mission is to ensure that employees work in a safe and healthful environment and to base enforcement actions on federal regulations. The agency's focus is not employer negligence except as it might apply to regulatory compliance. Thus, the Arbitrator is not bound by OSHA determinations, and that applies to both sides of the argument about there not being a citation issued. Nevertheless, the contemporaneous documentation by OSHA is exceedingly helpful, and the fact that both parties rely upon the "suggestions" eliminates the need for either parties to argue or qualify those findings by the neutral third-party investigator.

OSHA's suggestions are as follows:
1) Ensure there are signs on entrance doors that state how much cash is held at any time (e.g. "Less than $50 in register at any time"). These were not present at the Garden Ridge location.
2) Ensure there are height markers on entrance doors that allow for height identification of criminals or suspects. These were not present at the Garden Ridge location.
3) Ensure that all exterior lights are functional. There were multiple lights outside of the Garden Ridge location that were out, creating dark areas with no light directly outside of the entrance.
4) Ensure that all employees are familiar with all security features, to include the location of all silent alarms.
5) Ensure that policy and training are fully implemented regarding use of an alarm pendant, or remove the requirement to wear this pendant from your official policies. The pendant was never used at the Garden Ridge location by any staff members.

Both parties called witnesses who testified about the OSHA findings and most notable were the two previously mentioned experts. Both individuals are extremely well versed in their respective fields and both were of assistance to the Arbitrator in understanding different aspects of the case. Claimant's expert, Donald G. Strenk, earned a Bachelor of Science degree in Chemical Engineering and a Master of Business Administration in Finance. He has four decades of experience in the refining and petrochemical distribution, franchise, retail and commercial trading organizations, including for BP and ARCO. He has led business unit health, safety, and security functions for such companies, and most notably from 2010 to the present has been a Multi-Site Commissioned Operator (MSCO) for 12 ARCO am/pm facilities for BP, where he through his management consulting company has direct responsibility for retail gas station/convenience store operations on a daily basis, including the health and safety of all employees. He has what the Arbitrator refers to as "boots on the ground experience" and has direct industry experience in safely running gas station/convenience stores. In preparation for this case he visited the Garden Ridge store, although that visit was subsequent to the date of the robbery and murder. Regarding this visit and his testimony, the Arbitrator recognizes that the authority of the Arbitrator to judge Respondent is limited to its actions and inactions up to and including the incident in question as opposed to any location conditions that exist subsequent to the incident date.

Respondent produced an expert witness whose background and experience is markedly different than Strenk's but no less impressive. Karim H. Vellani is a security consultant and crime analyst with over 29 years' experience in security management, crime analysis, and forensic security consulting. He earned a Bachelor of Science in Criminal Justice (Specialization in Law Enforcement) and a Master of Science in Criminal Justice Enforcement. He also has many professional certifications. His focus is on statistical analysis of crime. He has not operated gas station/convenience stores and has not visited the Garden Ridge location. His background is statistics driven.

A review of the record, including the entire OSHA report (not limited to the "suggestions") makes it clear that Respondent did not have a culture of safety and that extended from the corporate level down to the store level, and back up to the corporate level. Respondent produced two site managers and a District Manager (who doubled as the Corporate Representative). Of note is that the Corporate Representative was not an employee of Respondent until after the incident and after the unexplained departure of the District Manager at the time of the robbery and murder (although the departed District Manager did provide a written statement to OSHA). While Respondent was certainly within its rights to not produce witnesses further up in the chain of command, it also limited the ability to determine exactly where the break in the safety chain occurred. Be that as it may, the record as a whole is more than sufficient to prove that Respondent's supervisory employees, all of whom are agents of Respondent, were lax in the enforcement of corporate policy and procedure and were negligent in overseeing compliance (or in this case, noncompliance).

As previously discussed, the life critical safety policies and procedures of Respondent were excellently written and demonstrate a professionalism that is expected of a nationwide employer. Had these been followed as written, Respondent would have had a much better argument that it (through its agents) was not negligent.

Returning to the OSHA findings, the Arbitrator finds that each of these observations (or suggestions) accurately reflect conditions at the Garden Ridge store on the date in question. While Respondent through its expert attempted to diminish the significance of all of these, the point remains that each of these represent a deficiency in safely conducting retail operations. Safety programs, especially life-critical safety programs, function most effectively when each step is followed. It is a matter of basic blocking and tackling. For instance, Claimant's expert testified about the industry standard of posting a sign on the door to alert would-be robbers that there was no more than $50 cash in the register, thereby introducing a risk analysis at the front door. Having height markers, although less of a deterrent than the dollar sign, nevertheless again is an industry standard. As to this item, testimony revealed that height markers previously were on the inside door frame but were never replaced after a new door frame was installed at some undetermined point in the past.

The next item is of huge significance to the Arbitrator's assessment of Claimant's allegations of negligence and gross negligence. On the date and time of the robbery and murder, outside security lights were not functioning. This created a blind side to the building and directly affected Respondent Doe's decision and strategy to rob the Garden Ridge store. The outside camera recorded Respondent Doe emerging from the darkened side of the building, peering around the corner, withdrawing into the darkness, and then emerging with a mask (or bandana) over his face. He then entered the front door and committed his felonious acts and then reversed his path and retreated into the darkness on the same side of the building. The video of the entire incident was played at the arbitration hearing. It is of immense significance that the non-functioning security lights on that side of the building were of key importance to Respondent Doe. He could have chosen to appear at the store in lighted areas but did not. He saw the benefit of hiding in the darkness and retreating in the darkness.

Respondent attempted at the arbitration hearing to argue that the side of the building was not dark despite the non-functioning security lights. It produced photographs from different angles to indicate the area had some illumination and later faulted Claimant's expert for not taking light readings when he visited the store after the date in question and observed that the side security lights were not working. As previously mentioned, the Arbitrator has not considered that part of the expert's testimony in deciding this case as it was after the fact.

The Arbitrator viewed the video of the robbery and murder and reviewed every one of the photographs in the Exhibit books, whether taken by OSHA or by the police. The Arbitrator notes that no one took

light readings and makes a finding that none needed to be taken to draw a conclusion as to whether the area was lighted. Based upon this review, the Arbitrator makes a finding that the non-functioning security lights put that side of the building in darkness. There is no need to debate further.

Having said that, it is noted that Respondent's expert testified on cross examination that lighting does not deter violent crime. That opinion is flatly rejected by the Arbitrator. By comparison, Claimant's expert testified convincingly that industry standards include the need for very bright lighting as most criminals are deterred due to the likelihood of identification and capture. The Arbitrator notes that industry standards for new stores of this nature may vary from older stores, but the point remains that Respondent had security lights on the side of the building for a purpose and that Respondent had an expectation of them working in order to protect its property and employees.

The side lighting issue is a prime example of the disconnect between corporate policy and local implementation. The Store Operations Guide in the previously discussed **Robbery Deterrence** section sets the following mandates for local management:

- Make a daily inspection of all inside and outside lighting
- A well-lit store greatly reduces the risk of being robbed as robbers tend to stay clear of well-lit locations.

Noting also that this is the second time that Respondent's expert contradicted Respondent's life-critical safety policies, it is clear from this that Respondent's agents negligently failed to follow their instructions from corporate. In fact, Respondent's Assistant Store Manager testified that the non-functioning side lights have been a problem for as long as he has worked at the store, namely 10 years (thus, even prior to Respondent purchasing the location from E-Z Mart). Testimony revealed that it is thought to be an electrical breaker issue that can be resolved by flipping the breaker, whenever a customer tells them the lights are out. The problem here is that no employee in the entire chain of command has ever addressed over the years the issue to the point of resolving the on-going problem. And of course, Respondent Doe saw the advantage and incorporated it into his plan of action.

OSHA's alarm pendant finding is yet another example of the Store Manager, Assistant Store Manager, and Regional Director consciously ignoring life critical safety policy. The afore-mentioned **Robbery Deterrence** section states as follows: "**Always** wear the alarm pendant." (emphasis added). And yet despite this, testimony revealed that employees never wore the pendant and this was known to Respondent's agents, who also did not wear the pendant. Respondent's expert testified that not wearing the pendant during the robbery would not have affected the outcome, but this conclusion overlooks a critical point, namely that no one knows what deterrents might have dissuaded Respondent Doe from committing his felonious acts. Of interest in this regard is the testimony of a witness who appeared by video deposition, Cristina Riojas-Ward. Ward was a clerk and co-worker of the deceased. She worked the afternoon shift the day before the robbery/murder, and left the Garden Ridge store at midnight when she was relieved by deceased, only three hours before the deceased was murdered. Ward immediately quit her employment upon hearing of the murder. She testified that she viewed the video of the incident and told the Store Manager that she thought she recognized Respondent Doe. The Store Manager was dismissive of her comment and apparently did not forward it to the District Manager. Also, OSHA did not interview Ward.

The point of all of this is that it is simply not known if Respondent Doe cased this location and determined that it would be an easy target because of the lax safety protocols. Unless Respondent Doe is captured and interrogated, no one, not even an expert, can definitively opine as to what was not a factor in convincing the felon to choose this location.

Moving beyond the OSHA findings, there are far more serious acts and omissions by Respondent's agents that establish negligence and gross negligence. The two most important involve the mandate to never lock the front door of the store and the operating hours. Beginning with the door lock, there was initial confusion as to whether employees could (physically) lock the door from the inside, or whether they were allowed to lock the door from the inside. At the arbitration hearing, the point was clarified. Physically they could turn a latch but Respondent did not allow them to do so. By orders, the door to the store was never to be locked. As mentioned at an earlier point in this Award, this was in sharp contrast to how Respondent handled its money. Unfortunately, Respondent protected its money better than it protected its employees.

The most important factor to be reviewed is the store hours. As discussed, Respondent operated this store 24 hours a day. It was always open for business. The Arbitrator recognizes that the decision to operate a retail store around the clock is an inherent management right and nothing in this Award is meant to diminish that right. Likewise, Claimant has raised no contrary assertion. The focus of this proceeding is to determine whether Respondent, having made a determination to operate as it did, provided a reasonably safe place to work for its employees as it is required to do by the State of Texas. Claimant takes the position that Respondent fell short of its non-delegable duty due to its negligence and gross negligence. Respondent argues otherwise.

The inquiry of whether Respondent took reasonable and feasible steps to protect its employees involves many considerations. Expert witnesses testified to industry standards (and in some cases the lack of them) while laymen testified to events that occurred in the Garden Ridge area and the immediately surrounding vicinity. All of these will now be examined.

Claimant's expert witness testified to industry standards that ranged from simple items such as not blocking windows with signage to physical barriers. He opined that industry standards include functioning exterior lighting, cash limiting signs on the front door, height markers on the inside door frame, alarm pendants or other visible deterrents to be worn by the employees, windows not blocked by signage or other objects such as soda dispensers, documented safety inspections, constant review of crime in the general area, paying attention to the activity of competitors within a 2-5 mile radius for business and safety reasons, and listening to employee safety complaints particularly as to security. As this witness noted, each of these failures by Respondent increased the risk of harm to all employees, including to the managers who were aware of these conditions and failed to remedy them. On each of these points there was clear and convincing testimony of acts and omissions by Respondent's agents that in the Arbitrator's opinion constituted negligence and, in some cases, gross negligence. For instance, there was a nighttime armed robbery within 2 miles of the Garden Ridge store, involving a Valero gas station/convenience store at 3:45AM, two years before; another armed robbery of a clerk at a Dollar Tree store occurred just months before the decedent was murdered and this was just across the highway from the Valero station. Although alarming to Respondent's employees who expressed concern to Respondent's agents about nighttime operation of their store, including working alone, the response by management was dismissive. Similarly, there were nighttime incidents at the Garden Ridge store involving Ward, one of which involved a customer pointing his finger as a gun at Ward as he drove away from the store after properly being denied service. Despite these nighttime incidents that were reported to management, the reaction was always dismissive, including at the arbitration hearing when both store managers testified that Ward was overly sensitive to things and tended to escalate situations. Respondent's position at the arbitration hearing was largely the same, taking the position that the Valero nighttime robbery was too far away and along an interstate corridor, and that the nighttime incidents at the Garden Ridge store, one of which required police intervention, were not robberies.

Claimant's expert also testified to the dangers of only having one person working at a store during nighttime hours, citing the general proposition that additional employees are a visual deterrent to would-

be robbers, and also citing legislative requirements for convenience stores such as in New Mexico (Statewide) (2005) and Gainesville, Florida (1992). The Arbitrator recognizes Respondent's position that these nighttime operating requirements, that include such mandates as having a physical pass-through window, on-site security, bullet-resistant safety enclosures or more than one employee on duty, are not required in Texas. Therefore, the Arbitrator does not find these to be industry standards and not controlling in this case. That being said, the fact that none are required by Texas State law does not rule out that some or all might be reasonable ways to protect nighttime employees in this industry. The Arbitrator also notes that the former District Manager in his written statement to OSHA, indicated that one of his district stores had a pass-through barrier. His comment was "It's inconvenient for people but it's also safe."

While employee concerns about nighttime safety, especially while working alone, were voiced to management by multiple employees including the deceased, it seems that these fell on deaf ears for years. However, at some point Respondent at the corporate level in response to these safety complaints made the decision to close the Garden Ridge store at 11PM and to remain closed until 6AM. Ward claimed she saw a posted memo announcing the closure and employees were relieved. Both the Store Manager and Assistant Store Manager denied having seen a memo but both acknowledged that a directive had come to cease overnight operations and that all employees were aware of the decision. The now-gone District Manager was also aware of the corporate decision to cease overnight operations. This was at least two months before the deceased was murdered. Some undefined security upgrades needed to be taken before the closure, the final one being to have a locksmith change the lock on the front door in order to provide keys to store management to lock the door from the outside when they closed. At the time there was only one such key and this was kept by the District Manager. While again undefined as to who was to schedule the locksmith visit, it is clear that it was above store management, thus being the District Manager or higher. Unfortunately, while the announcement of the nighttime closure was announced months before, the locksmith visit never occurred and the store remained open 24/7 until July 29, 2020 when the Garden Ridge store was robbed and Pollyanna was murdered. That very day Respondent got a locksmith to the store to change the front door lock and the store immediately ceased nighttime operations.

In addition to this testimony, Claimant produced a publication from the United States Department of Justice entitled *Robbery of Convenience Stores* that stated in pertinent part: "Operation hours are by far the strongest factor contributing to convenience store robbery, particularly for stores open 24 hours." The underlying reason is because those hours "carry a greater risk of being targeted." The Arbitrator accepts the conclusions of this and similar studies that were produced and finds that these publications, by impartial third parties are the types of studies that Respondent, as a nationwide operator of convenience stores, would be aware of as they are in the public domain.

The major point to be drawn from reviewing all of the undisputed facts about Respondent's (belated) decision to finally close the store after 11PM is that their failure to implement their own decision was the final and decisive act of negligence (and gross negligence) that resulted in the death of Pollyanna. Without diminishing all of the other negligent (and grossly negligent) acts and omission, Pollyanna would be alive today if the Garden Ridge store had been closed on July 29, 2020, as announced months earlier by Respondent.

Based upon all of the foregoing, the Arbitrator finds that Claimant has carried its burden of proof in establishing that Respondent was both negligent and grossly negligent.

Having previously established foreseeability, the next step is to determine if the negligence and gross negligence of Respondent were the proximate cause of Pollyanna's death. In this regard, Respondent argues that Respondent Doe was a superseding cause of harm to Pollyanna, thereby relieving

Respondent of liability that they otherwise deny. As previously discussed, the granting of Respondent's Motion for Leave to Designate Responsible Third Party John Doe imposed a burden on Respondent.

In examining this argument, the Arbitrator notes that to be a superseding cause (or intervening cause as it is often referred to) it must be an independent cause that could not have been reasonably anticipated -- in other words, the superseding cause could not be foreseeable. However, as discussed previously in this Award, the robbery of the Garden Ridge store and the murder of the clerk on duty were entirely foreseeable. Therefore, Respondent's request to have Respondent Doe declared as the superseding cause is denied. Accordingly, the Arbitrator finds that the negligence and gross negligence of Respondent were the proximate cause of Pollyanna's death.

The next matter for decision is an apportionment of damages between Respondent and Respondent Doe. Claimant proposes and the Arbitrator accepts that 70% shall be assessed against Respondent and 30% shall be assessed against Respondent Doe. The Arbitrator further finds that Respondent shall be jointly and severally liable for the damages.

The only remaining matter for decision at his point is the damages to be assessed. In a survivor cause of action, recoverable damages include mental anguish, physical pain and suffering of the deceased prior to the expiration of her life. The record provides clear evidence that the deceased experienced mental anguish, as well as extreme physical pain and suffering, and this was made evident by the video recording of the robbery and murder. The only open issue is how much was experienced and to this there is no easy answer. Respondent argues that death was immediate and therefore there was a finite time between Respondent Doe's entry into the store and the resulting death. Respondent points to the testimony of Virginia who indicated that her daughter's death was immediate upon the discharge of the firearm. Claimant argues that the death was not instantaneous as evidenced by Pollyanna's body twitching for minutes (not moments) subsequent to what was ultimately the fatal gunshot.

While there is no definitive answer to this time dispute, there is evidence that is of assistance to the arbitrator in making his determination. That evidence came during the testimony of Rehman, the current Claimant in the survivor action. Rehman is a Registered Nurse, obtaining that certification in 2007. During her career, she has taught in Air Force and Navy nursing programs as well as working in Emergency Rooms and Trauma ICU. Most recently, she practiced in Neurological ICU at the Cleveland Clinic. Rehman testified that her sister's death was not instantaneous but rather was prolonged. She further testified that she was the source of her mother's belief that Pollyanna had died instantly because she was trying to protect her mother from even more anguish than she was already experiencing. Rehman testified that, as a neurological trauma nurse she has worked with victims who have been shot repeatedly and seen them die due to severe neurological trauma. This professional experience was the basis for her assertion that the deceased did not die instantly. Based upon the Arbitrator's observation of the video as well as police reports of the deceased's body twitching for minutes, as well as Rehman's neurological based opinion, the Arbitrator makes a finding that Pollyanna did not die instantly upon being shot by Respondent Doe, but instead suffered gruesome mental anguish, physical pain and suffering during her final minutes of life. The Arbitrator cannot quantify the period of suffering beyond what has been stated above, nor is there the need to because there is no formula to apply to any given time period.

Claimant has set forth the rationale for the assessment of $5,000,000 for the survivor claim and the Arbitrator is in general agreement as to the methodology. Having considered this request, the Arbitrator feels that the requested amount is high, and accordingly resets the amount to $3,750,000 for the negligence claim.

Claimant further requests damages for gross negligence by Respondent in the amount of $750,000. Having considered this request, the Arbitrator resets the amount to $700,000.

Claimant further seeks pre and post judgment interest. The Arbitrator grants both interest demands and orders that they be assessed at the maximum rate allowed by Texas law.

Respondent requests in the alternative the defense of Payment and Offset in the amount of $100,000 (death benefit) and $9527.27 (funeral reimbursement). Claimant does not oppose. The Arbitrator grants this request.

The administrative fees and expenses of the American Arbitration Association totaling $2,950.00 shall be borne as incurred, and the compensation and expenses of the arbitrator totaling $48,312.37 shall be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby, denied. Further, all defenses not expressly granted herein are hereby, denied.

_Stephen A. McCarthy_
Stephen A. McCarthy

_May 8, 2024_
Date